\* Citizens' Rapid Transit Co. *v.* Dew.

(*Nashville.*    February 9, 1898.)

1. STREET RAILROADS.    *Negligence in operation of cars.*

It is the duty of a street railway company to provide a sufficient number of employes for the safe operation of its cars, and it is a question for the jury to determine, whether it is negligence to operate an electric car with only one employe, who does duty both as motorman and conductor, on a line laid on a turnpike, at grade, where persons, horses, and vehicles are constantly passing.    (*Post, pp. 320, 321.*)

2. SAME.    *Dog not a trespasser, when.*

A dog is not a trespasser on a street car track which is laid in the highway on the same level with it.    (*Post, p. 321.*)

3. SAME.    *Motorman cannot rely upon quickness and celerity of dog, when.*

A motorman cannot rely upon the quickness and celerity of a dog, to absolve himself from all duty and care to prevent running over him with an electric car.    (*Post, p. 322.*)

4. SAME.    *Habits of dogs may be looked to.*

A jury may consider common knowledge and observation about the habits and qualities of dogs.    (*Post, p. 322.*)

5. ACTION.    *Not lost, when.*

The right to recover for injury to a dog is not lost by killing him under the honest but mistaken belief that he was fatally injured.    (*Post, pp. 321, 322.*)

6. DOGS.    *Are property.*

The owner of a dog has such property in him that he may maintain an action for the wrongful killing or injuring him.    (*Post, pp. 322–325.*)

*The numerous and conflicting authorities as to property rights in dogs are reviewed in a note to *Graham* v. *Smith* (Ga.), 40 L. R. A., 503.—REPORTER.

Cases cited and approved: Wheatley v. Harris, 4 Sneed, 468; State v. Brown, 9 Bax., 53; Fink v. Evans, 95 Tenn., 416; 86 N. Y., 365.

7. SAME. *Pedigree of.*

Evidence of the pedigree of a dog is not inadmissible on the ground that it is hearsay. (*Post, pp. 325–329.*)

Cases cited: Flowers v. Haralson, 6 Yer., 494; Rogers v. Parks, 4 Hum., 480; Swink v. French, 11 Lea, 79; Morris v. Swaney, 7 Heis., 591; Ford v. Ford, 7 Hum., 92.

8. SAME. *Same.*

It is a matter of common knowledge that pedigree enters into the consideration of the value of dogs, including such as are kept for sporting purposes. (*Post, p. 325.*)

---

## FROM DAVIDSON.

---

Appeal in error from Circuit Court of Davidson County. JOHN W. CHILDRESS, J.

J. S. PILCHER for Citizens' Rapid Transit Company.

J. D. B. DEBOW for Dew.

WILKES, J. This is an action for negligently injuring and killing a dog. It was commenced before a Justice of the Peace, and, on appeal, was tried in the Circuit Court, before the Court and a jury. There have been two trials, the first resulting in a mistrial, and the second in a verdict and judgment for $250, and defendant, Rapid Transit Company, has appealed and assigned many errors.

They are too numerous to treat separately and seriatim. It is said there is no evidence to sustain the verdict. It appears that the Citizens' Rapid Transit Company operates a line of electric street cars from Nashville to West Nashville, over a highway known as the Charlotte Pike. This pike is a public thoroughfare for wagons and other vehicles, horses, cattle, pedestrians, and is much used and frequented.

The plaintiff was passing over this turnpike, returning from a nutting expedition into the country, in a conveyance with his two daughters. He had taken his gun with him, and also a favorite bird dog. The accident occurred about five o'clock in the evening. The dog was running along the turnpike, or thoroughfare, some one hundred and fifty or two hundred yards in front of the plaintiff's vehicle, when he started across the tracks of the street car line, which were laid on the bed of the turnpike, some little birds flying up attracted his attention, and he stopped in the center of the track, and, as some witnesses say, was in the act of "setting" the birds. The term "setting," as used here, has a somewhat technical meaning, and means that he was "standing" and intently looking in one direction. In dog parlance, therefore, "setting" means "standing," and the attitude is also called "pointing." While in this attitude a street car came up rapidly, and, some of the witnesses say, almost noiselessly, upon him, and ran over and

crushed him so much that his owner, seeing that he was fatally injured, shot and killed him. It appears that the gong was not sounded, the motorman did not shout at the dog, did not make any effort to check the car until it was so close that it was impossible to prevent running over the dog. The motorman excuses his act by saying that the dog came upon the track so abruptly and unexpectedly, and so nearly in front of the car, that there was no time to stop the car or sound the gong, or take any other precautions. There is other evidence to show that the dog could be seen, and was seen, quite a distance before the car reached him, and the weight of the evidence is in favor of this view of the case. The car was running rapidly and smoothly at the time, the dog was in plain view upon the track, and, according to some of the witnesses, the motorman was looking at him for some distance, and evidently expecting that he would leave the track in time to escape injury. All other questions out of the way, there is ample evidence to sustain the verdict of the jury as to the killing, the negligence of the motorman, and the reckless running of the cars at a rapid rate of speed, and without due precaution to prevent accidents to animals on the track.

It was not error in the trial Judge to charge that the street car company must have sufficient employes on its cars to operate them in a careful manner, so as to prevent damages or injuries to persons and animals that might go upon the track,

and was liable for a failure to do so, the question of what number would be sufficient being left to the jury under all the circumstances. It appears that, at this time and place, the motorman was the only employe on the car, and he was doing duty both as motorman and conductor, the latter having left the car after it passed from the more crowded portion of the track nearer the city. The roadway of the street car company being on the roadway of the turnpike, where persons, horses, and vehicles were constantly passing, and had the right to pass, and on the same grade as the turnpike, were all circumstances for the jury to consider, and they could properly do so under the charge as given. The motorman had also stated that the reason he did not see the dog sooner was because he was looking around at the passengers to see if any desired to get off, so that the charge was called for and appropriate.

It was not error to charge that, inasmuch as the street car track was laid on the roadway, and on the same level with it, that the dog was not a trespasser if he went upon the track, inasmuch as the dog was not improperly on the highway.

It was not error to tell the jury that if, after the dog was injured, his master killed him, under the honest belief that he was fatally injured, this would not prevent a recovery. The action in this case was for both the injury and killing, and if the jury should have found that the dog ought not to

16 p—21

have been killed, still the plaintiff would be entitled to damages for his injuries.

It is said that the Judge should have told the jury that the motorman might rely· upon the keen sense of hearing, great alertness, intelligence, and active celerity common to dogs, and they might consider and weigh their own practical knowledge as to the nature, character and quality of dogs, and consider all these matters in reaching a verdict in the case. The request we think is too broad; unquestionably, the jury might take·into consideration common knowledge and observation about the habits and qualities of dogs, but it was going too far to say that the motorman might rely upon the quickness and celerity of the dog, and thus absolve himself from all duty and care to prevent the accident, which is virtually what the request implies. The court sufficiently stated to the jury the rule applicable, if the dog appeared so suddenly and immediately in front of the car that it could not be stopped, and no precaution could have prevented the accident. The special request on this point was not necessary, nor as made was it correct.

Assignments are made which raise the question of the status of dogs before the law, and on what plane they are to be put, and how regarded. It has been held that the owner of a dog has such property in him as that he may maintain an action for killing or injuring him. *Wheatly* v. *Harris*, 4 Sneed, 468. Also, that he is the subject of

larceny as personal property. *State* v. *Brown*, 9 Bax., 53. It has also been held that a dog is an animal such as the statute contemplates in providing statutory precautions when they appear upon railroad tracks. *Fink* v. *Evans*, 11 Pickle, 416. It is true, that at common law a dog was not considered as property, the reason given being that they were base in their nature, and kept merely for whims and pleasures. But this rule of law has not found favor in later days, and the reason of the rule is not regarded as well founded.

In *Mullaly* v. *The People*, 86 N. Y., 365, the Court said, very enthusiastically, that "when we call to mind the fact that a small spaniel saved the life of William Grange, and thus changed the current of modern history, and when we consider the faithful St. Bernards, which rescue travelers caught in the storms which sweep over the crests and sides of the Alps, the claim that the dog is base in his nature is overthrown, and he cannot be left a prey to every person who chooses to steal or kill him. The rule of the common law was technical in the extreme, for while it was not larceny by it to steal a dog while living, it was larceny to steal his hide after he was dead."

Large amounts of money are now invested in dogs, and they are extensively the subjects of trade and traffic. They are the negro's associates, and often his only property, the poor man's friend, and the rich man's companion, and the protection of women and

children, hearthstones and henroosts. In the earlier law books it was said that "dog law" was as hard to define as was "dog Latin." But that day has passed, and dogs have now a distinct and well established status in the eyes of the law.

Much evidence is given in the case upon the question of the dog's pedigree and ancestry. The objections made are, that these matters are attempted to be proven by general reputation, and this is characterized as hearsay. But the question of pedigree and ancestry is a matter of common or general reputation, whether the question concerns horses, cattle, dogs, or men. The matter, from the very nature of things, depends upon reputation or common repute. It is shown that certain books are kept, and in them there is a registration of pedigrees kept up for the information of the public, not only as to horses, but also as to cattle and dogs. These are shown to be received as satisfactory evidence of pedigree in the same manner and upon the same idea as entries in family records of births, deaths, and marriages are received with regard to the human family. 18 Am. & Eng. Enc. L., 258; *Flowers* v. *Haralson*, 6 Yer., 494; *Rogers* v. *Park*, 4 Hum., 480; *Swink* v. *French*, 11 Lea, 79; *Morris* v. *Swaney*, 7 Heis., 591; *Ford* v. *Ford*, 7 Hum., 92. It is true, that in family records the entries in the books are usually made by the relatives and friends of the person, but inasmuch as dogs have no relatives competent to make entries for them, it is allowable for such entries to

be made by the owners, friends, and admirers of the dog.

Upon the general question as to the admissibility of evidence of the dog's pedigree, and the qualities and performances of his ancestors, we think there can be no doubt but that such evidence is competent. It is certainly competent to show pedigree upon the question of value of horses, cattle, and even sheep and swine—their different strains of blood, and especially as to horses and cows it is competent to show the qualities of the sires and dams and more remote ancestry, as these matters enter largely into the question of value.   It is a matter of common knowledge that the same questions enter in the consideration of the value of dogs, not only such as are kept for common use, such as guard dogs, shepherd dogs, Newfoundland dogs, but also such as are kept for sporting purposes, such as grey, blood, and fox hounds, bird dogs and others. There are high and low degrees among dogs as well as among men, and while the common coon dog has his value, it is not the same as that of the trained bird dog or the trained bloodhound.   It is a matter of common knowledge and observation that certain strains of blood among horses add materially, if they do not entirely fix their values, and so among cows and hogs and sheep, and even among chickens and turkeys.   Different strains of . blooded horses are valuable because it is found that for generations the achievments of horses of that strain

have been noteworthy upon the turf and elsewhere, and so with dogs these qualities, as a matter of common observation, are much the same in the same strain for generation after generation. We think there is no error in admitting evidence upon these matters of pedigree, and the reputation of this particular dog killed is shown to have had what, in dog circles, is regarded as "blue blood," and among these he belongs to the inner circles of the four hundred, a member of the F. F. T., or first families of Tennessee. In addition, he was of English descent. His sire was Champion Tribulation, by imp. Beppo III., out of imp. Champion Lass of Bow, and so on for twenty or more generations. His dam was Dick's Sue, by Dick, out of Ida Heath, etc., for as many generations. It is fully shown that on both sides the ancestry is traced back to the best of English nobility blood in dog circles. The sire of the dog is shown to have had a remarkable record in field trials and bench shows, and so with the dam.

Dogs of the grade of the dog that was killed, and with such pedigree, are shown by the proof to be worth from $500 to $1,000 in the market. It is also shown that this dog had had the distemper, and, under the proof, this added to his value one hundred per cent. It is attempted to show that this dog's descent may not have been entirely pure, and it is intimated that he may have had terrier blood in him, but the only foundation for this inference

is the fact that he "tarried" so long on the track when the car was approaching. But it appears from the record that it is a characteristic of the pointer, when he sets, to become oblivious to all earthly surroundings, and the bluer his blood the more absent-minded he becomes on such an occasion.

The question of pedigree is really important so far only as it bears upon the question of value of the animal killed. But it is evident, on examining the record, that the jury were not influenced by considerations of pedigree in fixing the damages, since they have named an amount below that fixed by any witness who placed a value upon the animal, based upon his pedigree, and adopted as their verdict the evidence given by the plaintiff and other witnesses of value, without regard to pedigree, and fixed the amount at the smallest sum named by him for the dog, taking in view his qualities, and in leaving out of view his ancestry or pedigree. The plaintiff fixes the value of the dog at $250, without any reference to his blood or lineage, and in this he is sustained. He describes him as a handsome dog, very fast, wide ranger, very stanch on his game and to the gun, thoroughly broken, a fine retriever from land or water, with an excellent disposition. He is shown also to have been a valuable, reliable yard and house dog, and to have made himself generally useful and almost indispensable to the plaintiff's household.

With such an eloquent recital of the dog's qualities, the jury could not, perhaps, have given less

damages than $250. The defendant company introduced no evidence of value, and no assignment is made that the damages are excessive. Whatever might be our opinion as to the value of a dog is immaterial, as we are controlled by the evidence in the record. While we have not passed seriatim upon the many errors assigned, we have considered them all, and given a general view of such matters as we consider important.

Upon the whole case, we are of opinion that the defendant company was guilty of negligence in the killing of this dog; that his death could have been prevented by the exercise of proper care and diligence; that he was fatally injured by the car, and killed as an act of humanity by his owner, and the company is liable for the killing. As to value, it is placed by the jury at the lowest estimate made by any witnesses, and evidently without regard to his pedigree or the performances of his ancestors.

We are satisfied with the verdict and judgment, and it is affirmed with costs.